
MSM/EGW: USAO 2024R00518

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND



UNITED STATES OF AMERICA      *
                              *
v.                            *   Case No. ▮▮▮▮▮▮▮▮
                              *
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮              *   Case No.   8:24-mj-2720-AAQ
                              *
and                           *
SARAH KATHERINE MAGID,        *   **Filed Under Seal**
                              *
Defendants                    *
                              *
                         *******

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS AND ARREST WARRANTS

I, Carley J. Langley, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, depose and state that:

### Introduction

1. I make this affidavit in support of the criminal complaints and arrest warrants.

2. Specifically, based on the following facts, I respectfully submit that there is probable cause to believe that, on or about March 23, 2024, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and SARAH KATHERINE MAGID ("MAGID"), did knowingly and intentionally conspire to distribute and to possess with intent to distribute a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide, commonly known as "fentanyl," a Schedule II controlled substance, and death or serious bodily injury resulted from the use of that substance, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C).

1

**Agent Background**

3. I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

4. I have been a Special Agent with the DEA since May 2020. I am currently assigned to the High Intensity Drug Trafficking Area ("HIDTA") Group 45 of the DEA's Washington Division Office.

5. As part of my employment with the DEA, I attended the Basic Agent Training ("BAT") Program, a 17-week resident program in Quantico, Virginia, that included academic instruction in the basics of report writing, law, firearms, surveillance techniques, interview and interrogation techniques, automated information systems, drug identification, and defensive tactics, as well as leadership and ethics. I have participated in numerous investigations and arrests involving violations of controlled dangerous substances laws, including fentanyl, and I have participated in the execution of numerous search and seizure warrants relating to these and other crimes.

6. As a result of my law enforcement experience, I have interviewed defendants and others who have had experience in the packaging and distribution of controlled dangerous substances. Consequently, I have become familiar with the phraseology and practices of those that abuse and illegally distribute controlled dangerous substances.

7. Because of my knowledge, training, and experience, and the experience of those with whom I work, I have become familiar with street sales of illicit drugs; the prices, quantities and packaging of illicit drugs; methods and modes of communication employed by drug

traffickers; language, terminology, traits, actions and coded language in particular used by drug traffickers; and the manufacturing and processing of controlled dangerous substances.

8. The information in this affidavit is based upon my personal knowledge and information gained from speaking with other officers and individuals involved in the facts described below or reading their reports. I submit this affidavit for the limited purpose of showing probable cause for the requested warrant. Accordingly, it does not set forth all of my knowledge about this matter. Statements and conversations are relayed in substance and in part, rather than being verbatim recitations.

## Probable Cause

9. On or about Monday, March 25, 2024, at approximately 8:51 p.m., law enforcement received a 9-1-1 call for an unresponsive individual inside of a known location (hereinafter, the "Victim's Residence") in Washington, D.C. The Victim's Residence shelters individuals recovering from drug and/or alcohol addiction.

10. In response to the call, D.C. Fire and Emergency Medical Services ("DC FEMS") personnel and Metropolitan Police Department ("MPD") officers were dispatched to the Victim's Residence. Upon arrival, first responders located Victim 1 unresponsive in his bed.[1] At approximately 8:56 p.m., Victim 1 was pronounced dead on scene.

11. During an on-scene interview at the Victim's Residence, an individual (hereinafter, "Witness 1") reported that he last saw Victim 1 alive the previous morning. Witness 1 stated that on Sunday, March 24, 2024, at approximately 8:00 a.m., Witness 1 was leaving for work when he saw Victim 1 heading for the bathroom in the residence.

---

[1] For purposes of this affidavit, Victim 1 and all witnesses will be referred to using male pronouns, regardless of their actual gender.

3

12. Witness 1 also told law enforcement that a day later, on Monday, March 25, 2024, at approximately 8:45 p.m., Witness 1 saw that a light was on in Victim 1's bedroom, which Witness 1 described as "odd." Witness 1 then told law enforcement that he contacted Witness 2 and Witness 3, and that the three individuals then went into Victim 1's room.

13. Witness 1 informed law enforcement that when the witnesses had entered Victim 1's bedroom, they observed Victim 1 lying on his bed with a blanket covering his face. Witness 1 noted that Victim 1 was unresponsive and "cold," so Witness 1 then called 9-1-1.

14. Upon confirmation of Victim 1's death and contemporaneous to the notification of additional MPD detectives, a medical examiner with the D.C. Office of the Chief Medical Examiner ("OCME") responded to the scene. The medical examiner processed Victim 1 on scene and noted to investigators that there were no observed indications of medical intervention or signs of violence to Victim 1's body. Victim 1's remains were then transported to the OCME so that an autopsy and toxicological analysis could be performed. On or around July 8, 2024, law enforcement received the autopsy report of finding from the OCME, which listed the cause of death for Victim 1 as "fentanyl toxicity."

15. On or about April 10, 2024, DEA investigators interviewed members of Victim 1's family. During this interview, a family member of Victim 1 provided Victim 1's cellular phone to law enforcement, as well as the password.

16. Victim 1's cellular phone was then transported to MPD's Digital Evidence Unit for extraction.

17. Upon the forensic analysis of Victim 1's phone, investigators located text message conversations between Victim 1 and **MAGID** utilizing a telephone number ending in 0246 (hereinafter, the "0246 Phone"). This phone was identified as belonging to **MAGID** based

on subscriber information obtained from service provider T-Mobile. The listed subscriber for the 0246 Phone returned to "Katherine L Magid." A query of Maryland Motor Vehicle Administration ("MVA") records identified Katherine Locke Magid, a white female, born in 1958, with a registered address in Burtonsville, Maryland 20866. Based on my knowledge gained from this investigation, I believe that Katherine Magid is **MAGID**'s mother and that **MAGID** is the user of the 0246 Phone.

18. Below is a partial transcription of the text message conversation between Victim 1 and **MAGID** that occurred on or about March 23, 2024 (two days before Victim 1 being pronounced dead on scene):

| Time | Sender | Message |
|---|---|---|
| 10:35 a.m. | Victim 1: | Can I come scoop a couple jaunt |
| 11:04 a.m. | **MAGID:** | Naa don't have any waiting for them |
| 11:06 a.m. | Victim 1: | You did all those jaunts last night ha |
| 11:25 a.m. | **MAGID:** | Nigga I sold u 4 and sold Adam 5 |
| 11:26 a.m. | Victim 1: | Damn can't even get a jaunt |
| 11:26 a.m. | **MAGID:** | Don't have any |
| 11:58 a.m. | Victim 1: | You want some from ■ |
| 11:58 a.m. | **MAGID:** | Yea |
| 11:58 a.m. | Victim 1: | How many? |
| 11:58 a.m. | **MAGID:** | 3 |
| 11:58 a.m. | Victim 1: | Idk what he's gonna do with the price tho |
| 11:58 a.m. | Victim 1: | Ok |
| 11:59 a.m. | Victim 1: | Usually he does 15 |
| 11:59 a.m. | Victim 1: | Ok 3. Ok I thought you were gonna say 30 but ite |
| 11:59 a.m. | **MAGID:** | Fuck that |
| 11:59 a.m. | **MAGID:** | I'll call him |
| 12:00 p.m. | **MAGID:** | Naw I want 30 |
| 12:00 p.m. | Victim 1: | Ok let me call him |

5

| | | |
|---|---|---|
| 12:16 p.m. | Victim 1: | 10 a pop |
| 12:17 p.m. | Victim 1: | Send da bread |
| 12:21 p.m. | **MAGID**: | He told me send him the bread and he gonna give you mine |
| 12:21 p.m. | **MAGID**: | So yea just grab them |
| 12:37 p.m. | Victim 1: | I'm not just delivering jaunts for |
| 12:37 p.m. | Victim 1: | For freee bro |
| 12:39 p.m. | **MAGID**: | Trying to give you a deal |
| 12:40 p.m. | **MAGID**: | And I got Xans |
| 12:48 p.m. | Victim 1: | Ok I'll get you the jaunts |
| 12:48 p.m. | Victim 1: | We gonna go to his crib |
| 12:51 p.m. | Victim 1: | I'm bringing them to you |
| 12:52 p.m. | Victim 1: | We're getting yours |
| 12:57 p.m. | Victim 1: | Send someone the bread |
| 12:57 p.m. | **MAGID**: | Already sent the bread |
| 1:01 p.m. | Victim 1: | So how much did he charge you |
| 1:02 p.m. | **MAGID**: | I told you he charges me less than that never paying 10 in my life shit dead |
| 1:04 p.m. | **MAGID**: | Better be 30 too |
| 1:06 p.m. | **MAGID**: | And if you paid 10 it's only because I got a rack so you already got aiced |
| 1:06 p.m. | **MAGID**: | U usually pay 15 |
| 1:10 p.m. | **MAGID**: | Sike I'll give you 1 I guess |
| 1:10 p.m. | **MAGID**: | As long as it's 30 |
| 1:14 p.m. | **MAGID**: | How far r u |
| 2:23 p.m. | Victim 1: | I'll be there in 8 minutes |

19.   I believe that the above conversation excerpts are the negotiation of a drug transaction between **MAGID**, Victim 1, and "███ The conversation started with Victim 1 asking **MAGID** if Victim 1 could obtain drugs from her ("Can I come scoop a couple jaunt"). **MAGID** responded by telling Victim 1 that she did not have any drugs currently to sell because she

already sold all of her supply ("Naa don't have any waiting for them" and "Nigga I sold u 4 and sold Adam 5"). Victim 1 then asked **MAGID** if she wanted drugs from "▇" ("You want some from ▇" **MAGID** replied to Victim 1 that she did want drugs from "▇" ("Yea"). Victim 1 asked **MAGID** how many she wanted ("How many") and **MAGID** initially said three but then corrected the order to 30 ("3" and "Naw I want 30"). Victim 1 then told **MAGID** that he would call "▇" to put in the order and to obtain a price ("Ok let me call him"). Victim 1 then informed **MAGID** that the price was $10 per pill and told **MAGID** to send the money ("10 a pop" and "Send da bread"). **MAGID** then replied to Victim 1 that she communicated with "▇" and that she would send the money to "▇" and that "▇" would give her ordered pills to Victim 1 for her ("He told me send him the bread and he gonna give you mine" and "So yea just grab them").[2] Victim 1 then told **MAGID** that he would obtain her pills from "▇" but suggested to **MAGID** that she needed to pay Victim 1 to transport them to her ("I'm not just delivering jaunts for" and "For freee bro"). **MAGID** responded to Victim 1 that she got Victim 1 a better price on the pills and told him that she had Xanax ("Trying to give you a deal" and "And I got Xans"). Victim 1 agreed to obtain the pills for **MAGID** from "▇" ("Ok I'll get you the jaunts" and "We gonna go to his crib"). Victim 1 then told **MAGID** that he would bring the pills to **MAGID** at her residence ("I'm bringing them to you" and "We're getting yours"). Victim 1 told **MAGID** to send the money to either himself or "▇" ("Send someone the bread") and **MAGID** replied to Victim 1 that she already paid "▇" ("Already sent the bread"). Victim 1 then asked **MAGID** how much "▇" charged her for the pills ("So how much did he charge you"). **MAGID** told Victim 1 that she paid less than $10 per pill and that she expected 30 pills to be delivered to her

---

[2] Investigators obtained call data records from the 0246 Phone and the telephone number ending in ▇ utilized by ▇ (as described below). These records revealed that ▇ called **MAGID** on March 23, 2024, at approximately 12:53 p.m.

7

("I told you he charges me less than that never paying 10 in my life shit dead" and "Better be 30 too"). **MAGID** also told Victim 1 that "▮ lowered the price for any pills purchased by Victim 1 because she purchased 30 ("And if you paid 10 it's only because I got a rack so you already got aiced" and "U usually pay 15"). **MAGID** then offered to give Victim 1 one of the pills she purchased from "▮ as long as Victim 1 delivered her 30 pills ("Sike I'll give you 1 I guess" and "As long as it's 30"). **MAGID** then asked Victim 1 when he would be arriving at her residence with the pills ("How far r u"), and Victim 1 advised in reply to her that he would be there in eight minutes ("I'll be there in 8 minutes").

20. Based on my training and experience, I believe the "jaunts" referenced in this conversation are pressed pills which contain fentanyl. "Jaunts" is a common term for pills, and my belief is based on the fact that **MAGID** stated that she also had Xanax pills ("And I got Xans"). In addition, based on my training and experience, the prices discussed are consistent with those for pills which have been pressed to appear like oxycodone hydrochloride 30 mg pills but which actually contain fentanyl.

21. Based on my training and experience, I also know that 30 pressed pills such as these, containing fentanyl, is an amount that is not merely for personal use but is consistent with possession with intent to distribute the pills. Each pill represents a typical single "dosage unit" of these pressed pills containing fentanyl. Individuals who purchase such a significant quantity will be selling at least a substantial number of the pills.

22. Victim 1's last communication on his cell phone was approximately 8:00 a.m. on March 24, 2024 (the day prior to Victim 1 being pronounced dead on the scene). Based on the level of decomposition of Victim 1's body at the time he was pronounced dead on the scene, there is reason to believe that Victim 1 may have died prior to March 25, 2024.

23. In May 2024, law enforcement interviewed an individual, who wishes to remain anonymous for fear of reprisals, and who for the purposes of this affidavit will be referred to as "CS1." CS1 was arrested for federal charges related to the distribution of fentanyl pills, which had been pressed to appear like oxycodone hydrochloride 30 mg pills. CS1 is an admitted distributor of such fentanyl pills, and as such, has knowledge of how controlled substances are distributed. CS1 does not have any criminal convictions to date and is not being paid for his cooperation with law enforcement. CS1 is cooperating with law enforcement in the hopes of receiving a lighter sentence for his criminal charges related to his activities as a fentanyl pill distributor. During the interview, CS1 identified ▓ who utilized a telephone number ending in ▓ (hereinafter, the "▓ Phone"), as one of his sources of supply for fentanyl pills. CS1 indicated that he obtained approximately 100 fentanyl pills at a time from ▓ CS1 also stated that ▓ now lived in a townhouse in ▓ Maryland, that was "across from a school" and a "little past ▓

24. In May 2024, investigators obtained the subscriber information and call detail records for the ▓ Phone from T-Mobile. The subscriber for the ▓ Phone was listed as "▓ with an address in Gaithersburg, Maryland. A query of the MVA online database for "▓ located "▓ a black male born in 1990, with a registered address of the same address in Gaithersburg, Maryland, as well as ▓ MVA photograph.

25. Recent queries of the MVA's online database revealed that ▓ has an updated address in ▓, Maryland ▓ (hereinafter, "▓ Residence"). The new address is a townhouse in ▓ Maryland, that is located across the street from ▓ School and northeast of ▓ Maryland.

26. During review of Victim 1's phone, investigators also located a text message conversation between Victim 1 and the ▮ Phone, believed based upon the above to have been being utilized by ▮ which began on or about January 30, 2024, and continued until on or about March 23, 2024. In particular, investigators observed a text message conversation between Victim 1 and ▮ which occurred on or about March 23, 2024, contemporaneous to the text messages between Victim 1 and **MAGID** referenced above. Below is a partial transcript of that text message conversation:

| 12:21 p.m. | ▮ | Go to ▮ elementary |
| 12:23 p.m. | Victim 1: | Ok |
| 12:23 p.m. | Victim 1: | Here |
| 12:28 p.m. | ▮ | Bet |

27. Based on my knowledge, training, and experience with narcotics investigations, as well as the time frame of both Victim 1's messages with **MAGID** and with ▮ I believe the above text message conversation is Victim 1 and ▮ coordinating the pick-up of the fentanyl pills by Victim 1 from ▮ on that date. ▮ directed Victim 1 to ▮ Elementary School in ▮ Maryland, where ▮ wanted to meet Victim 1 ("Go to ballenge creek elementary"). Victim 1 then confirmed the location with ▮ and told ▮ when he had arrived ("Ok" and "Here"). ▮ then acknowledged that Victim 1 had arrived ("Bet"). These texts occurred contemporaneously with the text messages between Victim 1 and **MAGID** on March 23, 2024, referenced above, where Victim 1 agreed to pick up 30 fentanyl pills from ▮ and deliver them to **MAGID**. **MAGID** further agreed to give Victim 1 one of the fentanyl pills in exchange for Victim 1 having picked up the 30 pills.

28. On or about July 28, 2024, law enforcement received an anonymous complaint about **MAGID**. The information stated that **MAGID**, an elementary school teacher at a specific

school in Silver Spring, Maryland, had come out of her classroom to sell drugs to other people outside her work. The information included photos of **MAGID,** information on her social media accounts, her current email address, and her phone number (the 0246 Phone). The tip also provided **MAGID**'s home address in Burtonsville, Maryland 20866 (hereinafter, "**MAGID**'s Residence").

29. Investigators met with the complainant and during the interview, the complainant stated that **MAGID** has been distributing drugs since approximately 2019, to include opioid and fentanyl pills.

30. The complaint also provided information that an individual named " ▇ was one of **MAGID**'s sources of supply for drugs. The complaint provided the ▇ Phone as " ▇ phone number. Investigators immediately recognized the ▇ Phone to be the same one utilized by ▇ to sell fentanyl pills to CS1.

31. On or about July 12, 2024, the Honorable Kevin Hessler of the Circuit Court for Montgomery County, Maryland, authorized search warrants for the historical cell site location information for Victim 1's cellphone from March 1, 2024, to March 31, 2024.

32. Analysis of the historical cell site data on Victim 1's phone showed that it traveled to the area of ▇ ▇ Elementary School in ▇ Maryland, the agreed upon meeting place between Victim 1 and ▇ as referenced above, and then traveled to the area of **MAGID**'s Residence during the time of the drug transaction on March 23, 2024, as referenced above.

33. On or about August 28, 2024, the Honorable David Lease of the Circuit Court for Montgomery County, Maryland, authorized a search warrant for **MAGID**'s cell phone device.

During review of **MAGID**'s phone,[3] investigators identified text message conversations in which **MAGID** bought fentanyl pills from ▮ on approximately 11 separate dates from on or about April 3, 2024, through on or about May 3, 2024.[4] The typical amount purchased during that period was 50 pills at a time. Based on my training and experience, I know that 50 pills such as these, containing fentanyl, is an amount that is consistent with possession with intent to distribute the pills. During that approximately one-month period following the overdose death of Victim 1, **MAGID** bought a total of approximately 425 pressed fentanyl pills from ▮ Based on my training and experience, I know that 425 pills such as these, containing fentanyl, likely yields a drug weight of at least 40 grams of a mixture and substance containing fentanyl.

34. For example, based on my training and experience, I know that one pressed fentanyl pill weighs approximately 0.1 gram. From approximately on or about March 23, 2024, through on or about May 3, 2024, ▮ and **MAGID** conspired to distribute and to possess with intent to distribute a total of at least 455 fentanyl pills, or approximately 45.5 grams of a mixture and substance containing a detectable amount of fentanyl.

35. A further review of **MAGID**'s phone revealed a text message conversation with an individual who, for the purposes of this affidavit, will be referred to as "Contact 1." Contact 1 is known to law enforcement and, based on the data in the phone, is a Xanax and fentanyl pills customer of **MAGID**. The conversation occurred on or about March 27, 2024, two days after Victim 1 was found deceased. Below is a partial transcript of the conversation:

| 7:10 p.m. | **MAGID:** | [*Victim 1*] didn't even pick up from me |

---

[3] Investigators did not identify any text message conversations on **MAGID**'s cell phone that were dated prior to April 3, 2024, as those messages appeared to have been deleted from the device.

[4] On two of these occasions, **MAGID** bought an unidentified number of fentanyl pills from ▮

| 7:11 p.m. | **MAGID:** | He stopped for a minute and picked up for the first time on Friday |
| 7:11 p.m. | **MAGID:** | Like u can't blame a dealer for shit |
| 7:12 p.m. | **MAGID:** | They don't put it up your b nose |
| 7:12 p.m. | Contact 1: | Just delete ours just in case. And anyone who u talk about joints. Just in case. |
| 7:12 p.m. | Contact 1: | Just to cover your ass |
| 7:27 p.m. | **MAGID:** | But nothing me and [*Victim 1*] text about implies that I sell shit |
| 7:28 p.m. | **MAGID:** | So I'm not Trippin about anything I barley do sell anything anyways I know what you do OK I've been an addict, so is your brother and that bitch was an addict herself too she used to do oxy, so what the fuck |
| 7:28 p.m. | **MAGID:** | I've never ever texted [*Victim 1*] and been like I'm good or any of that shit only thing she can see is [*Victim 1*] asking me if I wanted some because he's the one that brought me the Jones from ▇ on Saturday. |
| 8:47 p.m. | **MAGID:** | U want some zans |
| 8:47 p.m. | Contact 1: | Naw I'm good for now thx |
| 8:47 p.m. | **MAGID:** | Ok so you don't want the 1 |
| 9:25 p.m. | Contact 1: | No but can I get more joints |
| 9:43 p.m. | **MAGID:** | Waiting on ▇ idk wtf he doing idk if he got freaked out cuz I said [*Victim 1*] died |
| 9:45 p.m. | **MAGID:** | He's gonna come but lemme see |
| 9:46 p.m. | **MAGID:** | I can get jointd from somebody else in the mean time |

36.     Based on my training and experience, I believe that in the above conversation **MAGID** is discussing Victim 1's death with Contact 1. **MAGID** denied selling drugs to Victim

13

1 on the night of the distribution which resulted in his death ("[*Victim 1*] didn't even pick up from me") and said that the first time Victim 1 obtained drugs from her was the day before ("He stopped for a minute and picked up for the first time on Friday"). **MAGID** then stated that she did not think a drug dealer could be held responsible for the death of Victim 1 because Victim 1 chose to use the fentanyl ("Like u can't blame a dealer for shit" and "They don't put it up your b nose"). Contact 1 then advised **MAGID** to delete any conversations in which **MAGID** discussed fentanyl pills with Contact 1 and others in order to eliminate evidence linking her to the distribution of fentanyl pills ("Just delete ours just in case. And anyone who u talk about joints. Just in case" and "Just to cover your ass"). **MAGID** replied that she was not concerned because she believed that there were no text messages indicating that she sold fentanyl pills to Victim 1, and that a person reading the texts could only see Victim 1 offering to bring **MAGID** fentanyl pills from "███ on the night of the distribution which resulted in Victim 1's death ("But nothing me and [*Victim 1*] text about implies that I sell shit" and "I've never ever texted [*Victim 1*] and been like I'm good or any of that shit only thing she can see is [*Victim 1*] asking me if I wanted Some because he's the one that brought me the Jones from ███ on Saturday."). **MAGID** then asked if Contact 1 wanted to obtain Xanax from her ("U want some zans"). Contact 1 stated that he did not need/want any Xanax but asked **MAGID** if she would distribute fentanyl pills to him ("Naw I'm good for now thx" and "No but can I get more joints"). **MAGID** then told Contact 1 that she was waiting to obtain more fentanyl pills from ███ but that she suspected that he was concerned because **MAGID** told him about Victim 1's death ("Waiting on ███ idk wtf he doing idk if he got freaked out cuz I said [*Victim 1*] died"). **MAGID** then told Contact 1 that she believed that ███ was still going to deliver fentanyl pills to her and stated that she had another source of supply that she could obtain them from while she

waited on ▮ ("He's gonna come but lemme see" and "I can get jointd from somebody else in the mean time").

### Conclusion

37. Based on the foregoing, there is probable cause to issue the requested criminal complaints and arrest warrants.

Respectfully submitted,

*Carley Langley*

Carley J. Langley
Special Agent
Drug Enforcement Administration

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 4(d) this __1st__ day of November, 2024.

_____
The Honorable Ajmel A. Quereshi
United States Magistrate Judge

15